## WIBERT & HEBARD *vs.* THE NEW YORK AND ERIE RAIL ROAD COMPANY.

In an action against a rail road company for negligence, in not conveying a quantity of butter to market, within a reasonable time, the plaintiffs cannot recover as damages, the difference between the price of butter at the time it should have been delivered, and its price at the time when the butter in question was in fact delivered.

If a rail road is well equipped for a freighting business, and a delay in transporting goods occurs, which is occasioned by an unusual influx of business, beyond the immediate capacity of the road, and the goods are transported as expeditiously as is practicable in the existing condition of the road and the business, due diligence will be considered as having been used, and the rail road company will not be liable for any damages.

APPEAL from a judgment entered upon the report of a referee. The action was brought against the defendant for negligence in not delivering a quantity of butter, in the city of New York, in a reasonable time, by reason whereof the plaintiffs alleged they sustained damage, and lost great gains, which they would otherwise have made by the sale of the butter. The butter was delivered at Buffalo, to the Buffalo and New York City Rail Road Company, to be carried over it to Hornellsville, and thence over the defendant's road to the city of New York, for the plaintiffs, on the 18th day of January, 1853, and it was transported to Hornellsville in a reasonable time, seven hours,

and delivered to the defendant to carry to New York. It arrived in New York, January 31st, and was delivered the next day. The referee found that, during the month of January, a larger amount of freight than usual was received by the defendant to be transported to New York, and that it had accumulated upon its road. That the road was well equipped with cars and engines, but that the amount of freight received and accumulated exceeded the then capacity of the defendant to carry. He also found that six days would, at that time, have been a reasonable time to transport the butter from Buffalo to New-York, and he found that the defendant, not having transported the butter within that time, did not use reasonable diligence, and was guilty of negligence. He also found that the price of butter had declined four cents a pound, in the city of New York, between the 25th January (the time when he found the butter should have been delivered in New York) and the first day of February, (when it was delivered,) and he decided that the defendant was liable to the plaintiff for this difference, for the damages the plaintiff had sustained, amounting to $386.92. The defendant objected to the evidence tending to show a decline in the price of butter, upon the ground that the evidence did not furnish a proper basis of damages, and that the defendant was not liable for any loss arising to the plaintiffs from a decline in the price of butter. The objection was overruled, and the defendant excepted. The counsel for the defendant requested the referee to decide that if he found the delay in the delivery of the butter in New York was occasioned by the unusual accumulation of freight upon its road and at its depots, and by no other cause, then the plaintiffs could not recover. The referee refused so to decide, but decided that it would not furnish any legal excuse for the delay of the defendant. The defendant excepted.

The defendant requested the referee to decide that it was not liable in damages for the decline in the price of the butter, on the ground that the defendant had not made any contract with the plaintiffs to deliver the butter in New York by any *specified time*. The referee refused so to decide, and held that the

defendant was liable for such damages, though no time of delivery was specified ; and the defendant excepted.

*John   Ganson;* for the defendant.

*John  C. Strong*, for the plaintiffs.

*By the Court*, MARVIN, P. J.   Assuming that the defendant failed to transport the butter to New York within a reasonable time, and that it was, in this respect, guilty of negligence, what is the measure of damages ?   Can the plaintiffs recover, as damages, the difference between the price of the butter at the time it should have been delivered in New York, and its price at the time it was delivered ?   Is this difference in price the true measure of damages ?

The contract between the parties, *as implied by law,* was undoubtedly that the defendant should use due diligence, and deliver the butter within a reasonable time.   (*Story on Bailm.* § 545 *a.*)   Common carriers are held to very strict liabilities for an entire failure to deliver the goods they carry ; but the principles upon which these extraordinary liabilities are founded, do not extend to the *time* occupied in transporting the goods. (14 *Wend.* 215.)   The liability for delay in delivering the goods rests upon other principles.   Story says that, as to the time of delivery, their liability stands upon the same ground as that of ordinary bailees for hire. (*Bailments,* 545 *a.* 1 *Parsons on Cont.* 659.)   But this distinction will probably assist us very little in ascertaining whether the rule of damages adopted by the referee is sound.   The action is founded upon the duty of the defendant as a common carrier, and its negligence and default in performing the duty.   The measure of damages, however, in this case, will be the same as though the action was upon the contract implied by law.   Damages are given as a compensation, recompense or satisfaction to the plaintiff, for an injury actually received by him from the defendant.   They must be the *result* of the injury complained of, whether it consisted in the withholding a legal right, or the breach of a duty legally due to the

plaintiff. If the damages are the *natural* consequences of the act complained of, but not the *necessary* result, they are termed special damages. The damages to be recovered must always be the *natural and proximate consequence* of the act complained of. (2 *Greenl. Ev.* §§ 253, 254, 256 ; *and see Armstrong* v. *Percy*, 5 *Wend.* 538, 539 ; 6 *Hill*, 648 ; *Sedg. on Dam. ch.* 3.) Sedgwick; after discussing the question of nominal damages, proceeds to consider the general rule, which fixes the limit of compensation in cases where positive injury results from the alleged wrong, and he states that the rule prohibits any allowance for damages *remotely* resulting from the principal illegal act ; that such damages are frequently termed *remote damages* and sometimes *consequential damages ;* that these terms are not necessarily synonymous, or to be indifferently used ; that all *remote* damages are *consequential*, but all *consequential* damages are not *remote*.

These rules are well sustained by numerous adjudged cases. They are general rules, and have been applied to a great variety of facts and circumstances. They are, perhaps, as clear and definite as the subject admits of. It is not difficult to understand them, but the difficulty lies in their application to the thousand varying circumstances and combinations of facts arising and calling for their application. Hence the decisions that have been made, professedly founded upon these principles, seem sometimes to be conflicting ; owing to the different views of different minds, as to whether certain damages were the natural result of the act complained of, and whether they were *proximate* or *remote*.

In the present case, was the decline in the price of the butter, between the time when it should have arrived in New York, had the defendant used due diligence, and the time when it did arrive, a natural result of the delay of the defendant to deliver it, and was the loss, by the decline in price, a *proximate* consequence of the delay ? It is not enough that we can now see that if the butter had arrived in New York five or six days sooner, and the plaintiffs had sold it, they would have realized a larger amount for it. The question is, what connection or rela-

tion was there between the act complained of and the decline in market in the price of butter ? I am not able to see any. It was in consequence of the decline in price that the plaintiffs were unable to realize as much as they otherwise might have realized. If the price of butter had advanced during the delay of five or six days, they would have realized a larger sum for their butter (in case they sold upon arrival) than they would, had it arrived at the proper time and they had then sold it, and yet who can say that, in the case supposed, the prompt arrival of the butter caused the advance in its price ?

One might argue that the arrival of large quantities of any article in market would have a tendency to produce a decline in the price of that article, but how it can be argued that a decline in price is a consequence of the non-arrival of the article, I am not able to comprehend. There was no *natural* connection between the breach of duty by the defendant and the decline in the price of the butter in market. The damages flowed from the decline in price, and they are not the result of the delay. We shall have occasion hereafter to examine the cases which it is supposed authorized the ruling of the referee.

But if it could be established that there was a connection between the breach of duty by the defendants and the decline in the price of the butter in market, is it quite clear that the plaintiffs have brought their case within the principle of the rule requiring that the damages be *proximate* ? The law refuses to take into consideration any damages remotely resulting from the act complained of. The damages must not be too contingent and speculative. I find it difficult in this case to consider this part of the rule as to damages *remotely resulting* from the act complained of, as I have been unable to see that the fall in the market price of the butter *resulted* at all from the breach of duty by the defendant. This must be established before we can fix our minds upon the question of proximity or remoteness. "Remote and contingent damages, depending upon successive schemes or investments, are never allowed, for the violation of any contract." "It is not to be denied," says Nelson, Ch. J., in *Masterton* v. *Mayor of Brooklyn,* (7 *Hill,* 67,) " that there are

Wibert *v.* New York and Erie Rail Road Co.

profits or gains derivable from a contract, which are uniformly rejected as too contingent and speculative in their nature, and too dependent upon the fluctuations of markets, and the chances of business to enter into a safe or reasonable estimate of damages." The judges here speak of damages that may be traced to the breach of the contract. Had the plaintiff in the present case entered into a contract with the defendant for the transportation of the butter or other property to New York, for a fixed price, and the defendant had failed to perform the contract, and the plaintiffs had employed another carrier, and necessarily paid larger prices than by their agreement they were to pay the defendant, I could see that the difference paid by them would be damages *resulting* from the breach of the agreement. So, when A. contracts with B., to sell to him certain property, at a fixed price, to be delivered at a certain time and place, and fails to perform his contract, and the property is worth more at the place and on the day it was to be delivered, I can understand the principle upon which A. should respond in damages. B. made a contract, and had that contract been performed, he would have made as profits the difference between the price he was to pay and the value of the article, at the time and place of delivery ; and the profits he could thus have made are, in law, his damages. They *result* directly from the breach of the contract, the act complained of. So, when one contracts to do a particular work or job, at a specified price, he, upon the performance of the work, is entitled to the price stipulated, though half, or more of it, may be profits. If then the other party to the contract prevents his performing it, he can recover, as damages, the amount he could have made as profits. He has lost this amount in *consequence* of the breach of the contract. It is the *result* of the breach.

The argument to connect the alleged loss in this case, with the negligence of the defendant, is this : The defendant undertook to transport the butter to New York. With diligence it could have been transported by a certain day ; on that day butter was worth, say 20 cents a pound ; the butter, by the negligence of the defendant, did not arrive in New York until five or

six days after the time it should have been there, when butter was worth but 16 cents a pound ; the negligence of the defendant, therefore, was the cause, not of the decline in the price of butter, but of a loss to the plaintiff of the amount of the decline.

Suppose that we admit this brings the case within the rule of resulting damages, *i. e.* that the loss was the *consequence* of the negligence, and the question will then be presented, were the damages *proximate ?* Damages may be consequential, and yet so remote as not to be allowable. In the present case, as we have seen, there was no connection between the breach of duty by the defendant, and the decline in market of the price of butter, by reason whereof the plaintiffs were unable to obtain as large a price as they could have obtained a few days before. True, if the defendant had performed his duty faithfully, the property of the plaintiffs would have reached the market at a more favorable time. But the immediate or proximate cause of loss, if we may call it loss, was the decline in the market, and had the defendant delivered the butter before the decline, a higher price could have been obtained. Thus it may be said that the plaintiffs sustained a loss in consequence of the non-delivery of the butter in time, and the decline in price. If butter had not declined in price, the plaintiffs would have lost nothing by the delay, except, perhaps, the use of the property, the interest upon its value during the time. If butter had appreciated in value during this delay, then the plaintiffs may have derived a benefit by selling it for the advanced price. And here various *contingencies* enter into the question, considering it at the time when the defendant entered upon the performance of its duty to transport the butter to New York in a reasonable time. The case discloses nothing by which we can say whether the price would or would not decline, or whether the parties contemplated either event. Either event was entirely uncertain and contingent. In one event the plaintiffs might gain by a delay in the delivery, in the other event they might lose. The market was fluctuating. Again, we do not know, though perhaps we should assume, contrary to what often happens, that the plaintiffs would have sold

their butter on arrival. Suppose the butter had duly arrived, and the plaintiff had decided to hold it for a higher price, and the price had declined, then they would have lost. If it advanced then they would have gained. Other contingencies will occur. Should the defendant be responsible for any of these contingencies?

In some of the cases arising upon contract, the court says, that the party in default should be held liable for all losses that may fairly be considered as having been in the contemplation of the parties at the time the agreement was entered into. (*Sedg. on Dam.* 58, 112, 2*d ed.*) (I apprehend, in this case, that the rule of damages is the same as though the action had been brought upon the contract implied by law as springing out of the duty of the defendant.)

Apply the rule to the present case. Is there any thing indicating that the parties had in contemplation a decline in the price of butter in New York, within a few days, or that the attention of the defendant was called to any consequences injurious to the plaintiffs, likely to ensue, if the defendant should fail to deliver the butter with all due diligence? (*Sedg. on Dam.* 112.) There is nothing bringing the case within this rule. If the defendant is to be held liable, it must be upon the principle that it took the risk of a decline of price in the market. That it was responsible for this contingency. Such a principle, applied to common carriers, would be extremely stringent and dangerous. It will be easy to prove, as in this case, the usual time for transportation from one place to another, and when this time has been exceeded, such proof will make out a *prima facie* case of negligence, often extremely difficult for the carrier to disprove. The consequences may be ruinous. The property may arrive a day or two too late, when the market has been suddenly depressed, and perhaps the depression has been partly owing to the arrival of the very property, causing a surplus or abundant supply. The decline may be temporary, and the market may rally in a few days, and the owners of the property be able to sell at prices better than the prices on the day the property ought to have arrived, but the carrier is to derive no

benefit from the advance in price, after the delivery. He must pay, as damages, the difference between the price on the day when the property should have been delivered, and the day when it was delivered.

The argument and brief of the counsel for the plaintiffs show that he has been diligent in the examination of this case, but the authorities he cites do not, in my opinion, sustain the decision of the referee. He only claims, for most of the cases, that they establish principles, which by analogy should be applied to sustain the decision in the present case. He concedes that the case is one for compensatory damages only.

If the carrier entirely fails to deliver the property, the cases show that the measure of damages is the value of the article, at the place for the delivery, and at the time when it should have been delivered. These cases, cited by the plaintiffs' counsel, do not decide the present case. It is argued that as an entire failure to deliver will make the carrier liable in damages, for the value of the article, at the time it *should have been delivered*, the same rule should be applied when there is a *delay* in the delivery. The rule, when there has been a failure to deliver, is a convenient and practicable one, and excludes contingencies. It does not give to the owner of the property the chance of getting a higher price, by an advance in market, after the day when the property should have been delivered. To make this rule entirely applicable, it should be established that the owner has the right, when there has been a negligent delay, to decline to receive the property, and also that in such case the carrier has the right to keep the property, upon paying its value on the day it should have been delivered. No such rules have been established. If there has been a negligent delay, the owner must receive the property, and the carrier must deliver it. The title of the property has not been changed by the delay. I am not speaking of cases where the circumstances are such as to show that the property was willfully delayed and retained by the carrier, when he has acted in bad faith. He may so act as to make himself liable for a conversion of the property. Nor are those cases in point, when the property has been embezzled

or lost on the way. Nor do I think the rule which makes the vender of property, to be delivered at a certain time and place at a certain price, liable, upon failure to deliver, for the difference in value between the contract price and the value at the time and place of delivery, applicable to the present case. Though it seems to me that the analogy is stronger than in the cases above stated. The *vendor* agrees to sell his property, and the vendee to purchase it; the vendee is bound to receive the property if offered; if he refuses he breaks his contract, and if the property is not worth the price he agreed to pay, he must respond to the vendor in damages for the difference. There is a mutuality of risk. In the case of the carrier, he is a mere bailee for hire. The property is not his; it belongs to the bailor, who may retain the title as long as he pleases, and who, if it increases in value, is entitled to the benefit; if it declines in value, he is to sustain the loss. Striking analogies may often be seen, which it would be dangerous to follow. It has seemed to be necessary to divide the multiplied transactions among men into classes or chapters, and apply to those belonging to one class a set of principles, and to another class other principles, calculated to meet the particular circumstances generally belonging to the class, and calculated to do justice. The law touching domestic relations has its peculiar principles, so of vendor and vendee, and so of bailor and bailee, and the numerous subjects as common carrier, &c., embraced under the head of bailor and bailee. Analogies are very useful, and it is important to preserve the analogies of the law, if we can do so without infringing other analogies and principles.

But let us refer to some of the cases where damages have been allowed as proximate, and which it is supposed sustain the ruling in this case. In *Davis* v. *Garrett*, (6 *Bing*. 716,) the defendant undertook to transport the lime of the plaintiffs. He voluntarily and unnecessarily, without any justifiable cause, *deviated* in the voyage from the usual course, and during the deviation the lime was wet, in a tempest. It set fire to the ship, and the whole was destroyed. The objection was taken that there was no natural or necessary connection between the

wrong in taking the barge out of its proper course and the loss of the lime; that the same loss might have been occasioned by the same tempest, if the barge had proceeded in her direct course. This objection was overruled, and Justice Tindal remarks, if this argument were to prevail, the deviation of the master, which is undoubtedly a ground of action against the owner, would never, or only under very peculiar circumstances, entitle the plaintiff to recover; for if a ship is captured in the course of her deviation, no one can be certain that she might not have been captured if in her proper course. He adds, however, as the last answer to the objection, that no wrongdoer can be allowed to apportion or qualify his own wrong; and that as a wrong has actually happened, whilst his wrongful act was in operation, and which is attributable to his wrongful act, he cannot set up, as an answer to the action, the bare possibility of a loss, if his wrongful act had never been done. I do not think this case applicable. An unjustifiable deviation in the voyage rendered the ship-owner liable for losses arising from capture, &c. &c., and the insurance is discharged. The ship-owner, by the wrongful deviation, takes many risks upon himself, and the courts will not, when loss has occurred, speculate upon the question, whether it would probably have occurred, had there been no deviation. It is the duty of the master of the ship to proceed to the place of destination without *delay*, and although there are many cases of *deviation*, and loss of the goods and liability thus incurred, I find no case fixing the rule of damages for a *delay*, when the property has not been lost or injured, but has arrived at the place of delivery and has been delivered. In *Bush* v. *Norton*, (2 *McLean*, 422,) it was held, when the vessel was driven into an intermediate port disabled, to be the duty of the master to repair her in a convenient time, or to procure another vessel to convey the property on its course, and if he failed to do so, *he was not entitled to freight*. In *Davis* v. *Garrett*, (*supra*,) the deviation was *voluntary* and unnecessary; it was a positive and affirmative wrong, and the property was actually lost while the defendant was thus acting in the wrong, and the court cast upon him all the risks. If the property had

been insured, this act of deviation would have discharged the insurers. The case is not in principle like the one under consideration.

*Bracket* v. *McNair*, (14 *John.* 170,) is not applicable. The case is peculiar, and as an authority, should be confined to its precise circumstances. The note of the reporter is calculated to lead to error. The contract was to transport salt from Oswego to Queenston, a ta fixed price per barrel. The defendant was to carry half the salt the first trip his vessel should make, and the remainder on the second trip, or sooner if possible. The ship made a trip, but took none of the salt. Soon after this, information was received, by the collector at Oswego, of the non-intercourse act of the United States. The court held that the plaintiff was entitled to recover the difference between the value of the salt at Oswego and Queenston. (Less, I suppose, the cost of transportation.) It will be seen that the non-intercourse act prevented the transportation of the salt by the plaintiff, after the failure of the defendant to perform his agreement. And the damage which the plaintiff *necessarily* sustained was the difference between the value of the salt where it was when the act of congress arrested it, and the value at the place where it would have been had the defendant performed his agreement. But for the non-intercourse act, it would have been the duty of the plaintiff to have procured some other conveyance for the salt, and if he had been obliged to pay more than the contract price with the defendant, he would have recovered the difference in damages for the breach of the contract.

*O'Connor* v. *Foster*, (11 *Watts*, 418,) was decided upon the authority of *Bracket* v. *McNair*. The defendant agreed to transport wheat from Pittsburgh to Philadelphia, at a season of the year when there was great danger of the freezing of the canal. The defendant finally refused to enter upon the performance of the contract, and the plaintiff could not obtain any other conveyance. These cases rest upon their peculiar circumstances. The defendants, by these contracts, took all risks, and failing to perform their agreements, in one case the property could not be transported without a violation of the non-inter-

course act; in the other, no one would undertake to transport the wheat, owing to the danger of the canal freezing. These cases have no application to the present case.

As to the application of the rule, that the damages must be the natural and proximate consequences of the act complained of, see *Deyo* v. *Waggoner*, (19 *John.* 241;) *Dorwin* v. *Potter*, (5 *Denio*, 306;) *Armstrong* v. *Percy*, (5 *Wend.* 535;) *Hargous* v. *Ablon*, (3 *Denio*, 406;) *Masterton* v. *Brooklyn*, (7 *Hill*, 64;) *Bennett* v. *Lockwood*, (20 *Wend.* 223;) *Clark* v. *Brown*, (18 *Id.* 229;) *Blanchard* v. *Ely*, (21 *Id.* 342;) *Walrath* v. *Redfield*, (11 *Barb.* 368;) *Lawrence* v. *Wardwell*, (6 *Id.* 424;) *Vanderslice* v. *Newton*, (4 *Com.* 130.)

In my opinion, the referee erred as to the measure of damages. It is not denied that a carrier may make a special contract for the delivery of property in a certain time, so as to throw upon himself all the risks of loss by a decline of the price in that market. Parties may make any contract not illegal; and if a carrier expressly agrees to deliver property by a certain time, and in default thereof to pay all loss arising from a decline in price, he may do so; or if he is informed by the owner of special reasons for the delivery of the property by a certain day, and he agrees to deliver, he will be liable upon his contract for the damages contemplated by the parties. But such is not this case. In *Wilson* v. *The York, New. C. & B. R. R. Co.*, reported in a note, 18 *Eng. L. & Eq.* 557, the plaintiff contracted with the defendants to transport fresh fish to market. The defendants neglected repeatedly to deliver the fish in proper time for the market, and Justice Jarvis instructed the jury that the plaintiff was entitled to recover whatever damages he had sustained by the loss of the profits of an early sale of it at Billingsgate market. The case, upon the trial, was put upon the ground of an express agreement to deliver the fish at the market by a certain hour in the day. The article was also perishable, &c. &c.

The referee erred, I think, in deciding that if the delay in the delivery of the butter was occasioned by the unusual accumulation of freight upon its road and at its depots, *and no other*

*cause,* this would furnish no legal excuse to the defendant. He also decided that, although by the amount and accumulation of freight the road was taxed beyond its capacity, it did not form any legal excuse for the delay in transporting the butter. He had found as facts that a larger amount than usual of property had been received by the defendant to transport to New York, and that it had accumulated on the road, that the road was well equipped with cars and engines, but that the amount of freight received and accumulated exceeded the then capacity of the defendant to remove.

The decision of the referee is attempted to be sustained by section 36 of the general railway act of 1850. (*Sess. Laws 1850, p.* 231.) It is there enacted, that every such corporation shall start and run the cars for the transportation of passengers and property at *regular times,* to be fixed by notice, and shall furnish sufficient accommodations for the transportation of all such passengers and property, as shall within a reasonable time previous thereto be offered for transportation, at the place of starting, and at the junction of other rail roads, &c. and shall take, transport and discharge such passengers and property at, from and to such places, on the due payment of freight or fare, legally authorized therefor ; and shall be liable to the party aggrieved in an action for damages for any neglect or refusal in the premises. It is insisted, and as I understand the decision it was so held, that the defendant was bound to transport the property to New York within such time as was a reasonable time for a freight train to pass from Hornellsville to New York. In other words, that the defendant must be prepared at all times to receive and transport, directly, all the property offered. That although the road may be well stocked, and there may have been a sufficient number of cars and engines to transport promptly all property offered during an entire year previous, yet if the property offered for transportation shall be suddenly increased in amount beyond the capacity of the road, that will constitute no excuse for delay. I do not think the statute requires a construction leading to such results. Rail road companies are to start and run their cars at regular times, to be fixed by public notice.

This is important to the public and to the company. It will not do to start trains at any time, as boats are started upon the canal, or teams upon the highway. Again, the capacity of a rail road is limited. It is not possible to do an unlimited amount of business, either with a double or single track. More may be done with a double than a single track. Does it follow that because for a month or two during the year more freight may be offered than can be carried upon a single track, the company is bound to construct a double track, to accommodate that press of business for two months, though during the other ten months there shall not be business enough for the road? This will hardly do. In this case the referee finds that the road was well equipped with cars and engines, but that the amount of freight was beyond its capacity. And he held that this constituted no excuse for delay in transporting the plaintiff's property. It was utterly impossible for the defendant to relieve itself from the difficulty. The most extraordinary diligence could not save it from damage. It did all it could do; but the property offered for transportation at that time was more than *could be transported* upon the road. It exceeded the capacity of the road. The only way the defendant could have been saved from damages was to have anticipated the increased amount of property to be offered at that time, and to have constructed another track. But this would have required some years, and some millions of money. The statute requires no such construction. All statutes should be considered in reference to their subject matter, and should receive a reasonable construction. The corporation should provide a reasonable equipment for their road, considering the amount of business to be done upon the road. They should expect that more business would offer at some times than at others, and they should therefore have a reasonable supply of extra cars and engines. But they are not bound to provide for a great, sudden and unexpected influx of business, so as to prevent all accumulations. If they find their business increasing, they should increase their cars and engines, and prepare for the increased business of the country. But having equipped their road to its full capacity, I am not

prepared to say that they are bound to construct a double track, though there may be business enough for a double track.

If the road was well equipped, and the delay was occasioned by an unusual influx of business beyond the immediate capacity of the road, and the butter was transported as expeditiously as it could be, in the then condition of the road and the business, the defendant was not liable for any damages. Due diligence was used. (*Parsons* v. *Hardy,* 14 *Wend.* 215. 12 *Barb.* 321.)

The judgment should be reversed, and there should be a new trial.

[ERIE GENERAL TERM, January 23, 1854. *Marvin, Bowen* and *Mullett,* Justices.]