FRANCIS L. CUTTING & another *vs.* GRAND TRUNK RAILWAY COMPANY.

If a common carrier unreasonably delays to transport and deliver goods intrusted to him for carriage, and their value in market meanwhile falls, the measure of damages in an action against him is the difference between their market value at the time when and place where they ought to have been delivered and their market value at that place on the day when they were delivered; although there was no contract to deliver them within any certain time, and the goods were not intended to be used for any special purpose at any certain time, and the carrier finally delivered them in the same condition as when they were received by him.

REPLEVIN of five hundred barrels of flour. The writ was dated May 3, 1865. The answer alleged that the defendants, as common carriers, had a lien upon the flour for charges of trans-portation, and were entitled to the possession thereof until said charges were paid.

At the trial in the superior court, before *Vose,* J., the plaintiffs introduced evidence tending to show the following facts: The flour was forwarded to the plaintiffs by their agent from Mil-waukee, over the Detroit and Milwaukee Railroad, which con-nects with the defendants' railroad at Detroit Junction, and the

defendants' railroad, to Boston, at a freight of $2.60 per barrel, and arrived at Detroit on or before the 26th of December 1864 and on that day, and daily thereafter, was offered to the defendants, by requesting them to send cars to load it, according to the usual course of business, in reply to which the defendants said they would take the flour as soon as they could; and on the 8th of February 1865 they did take three hundred barrels thereof, and the remainder on the 20th of said February, and transported the same to Boston, where it arrived on various days shortly after the 22d of April 1865. The defendants' agent refused to deliver the flour to the plaintiffs until their freight and charges, amounting to thirteen hundred dollars, were paid; and the plaintiffs presented to him an account of losses and damages sustained by reason of the delay in the transportation, amounting to about sixteen hundred dollars, being solely for the decline in the general market value of the flour. The usual time for transporting flour from Milwaukee to Boston by this route was from ten to twenty days. The defendants, after taking the flour, and before delivering it in Boston, received and transported over their road other goods, consisting principally of dressed hogs, sent from Chicago and St. Louis, and delivered them before the arrival of the flour, receiving for some of them a higher rate of freight than for flour. They also gave preference to goods, consisting principally of boxed salt meats, destined for England by the Portland and Liverpool steamships. Dressed hogs are perishable freight, and are usually preferred, and the freight for England was of a kind which could be sent on open platform cars, while flour could not. The flour was of a grade and quality well known in Boston, and had there a market price ascertainable daily. Between January 1st and March 15th 1865 this market price ranged from $11.25 to $10.50 per barrel; and about the middle of March it began to decline, and was from $7.75 to $8 per barrel when this flour arrived there; and at that time freight had fallen, and the defendants were then delivering flour from Milwaukee at $1.50 per barrel.

The plaintiffs contended that they were entitled to recoup from the defendants' freight the damages suffered by them by

reason of the non-delivery within a reasonable time by the defendants of the goods in respect of which the defendants claimed said freight, and that the measure of their damages was the difference between the market price of the flour at the place of delivery, and at the time when it should have been delivered, and the market price thereof at the time when it actually arrived in the place of delivery, with interest from that time, no evidence being offered of any other damages, and that, if the jury should find the amount of such damages to be equal to or to exceed the amount of freight due to the defendants, their verdict should be for the plaintiffs.

The defendants did not open their case to the jury, but contended that, upon the evidence offered by the plaintiffs, they were entitled to a verdict in their favor; and the court so ruled, and also that where damages are claimed against a common carrier for delay in the transportation of goods intrusted to him, in the absence of any stipulation to deliver at a time certain, and of any notice as to the purpose for which they are to be used, the measure of the plaintiffs' damages is interest upon the value of the property from the time when it should have been delivered to the time when it actually was delivered, such value to be computed and ascertained in the place of delivery and at the time when the delivery should have been made; that, applying this rule to the present case, the amount of the plaintiffs' damages could not equal the defendants' freight; and he directed the jury to return a verdict for the defendants.

The plaintiffs alleged exceptions.

*E. Bangs,* for the plaintiffs.

*G. O. Shattuck & J. B. Thayer,* for the defendants. The rule contended for by the plaintiffs is not a just rule. It is at most only just when applied to the case of an actual sale of the goods, to be delivered, and a breaking up of the sale by reason of the delay. And it is not probable that the plaintiffs suffered by the delay. While the flour was on its way, the rebellion was overthrown, currency increased in value, nominal prices in currency decreased, and prices in gold advanced. Measure the value in gold, and the plaintiffs suffered no loss. Besides; the

plaintiffs might have sold the flour *in transitu.* The flour was received in perfect condition. It is a fact within general knowledge that all prices soon after advanced. If the plaintiffs could not sell *in transitu,* their only damages were the loss they probably would have sustained. No merchant sells all his flour at the highest market price. Perhaps the plaintiffs would not have sold at that price, and perhaps they could not have done so. Their chance of selling is all they lost. This chance is represented by interest. 3 Parsons on Con., 197, note *j,* and cases there cited. *Adams Express Co.* v. *Egbert,* 36 Penn. State R. 360. The damages claimed are too remote. The authorities are against the plaintiffs. [See cases cited in the opinion.] In Massachusetts, the court has applied the rule limiting damages to the direct and natural result of the injury with great strictness. In trover, only the value at the time of the conversion and interest can be recovered. *Greenfield Bank* v. *Leavitt,* 17 Pick. 1. The same rule is applied to contracts of sale. *Bartlett* v. *Blanchard,* 13 Gray, 429. There are cases in which the advantage of one market or market day or season over another is very great, and the loss of a market may be the natural and contemplated result of delay. But such was not this case.

GRAY, J. The only question which has been argued upon these exceptions is of the measure of the plaintiffs' damages for non-delivery of their goods. After full consideration of the able and elaborate arguments of counsel, the court is unanimously of opinion that the instruction requested by the plaintiffs at the trial should have been given, and that the instruction under which a verdict was returned for the defendants was erroneous.

It is the duty of a common carrier, receiving goods for transportation, to deliver them at the place of destination at the time agreed upon, or, in the absence of any agreement, within a reasonable time ; and if he fails so to deliver them, without sufficient excuse, he is responsible in damages. The general principle upon which the damages for the breach of a contract to deliver goods are to be assessed is well settled. It is compensation for the injury of not having the very thing, *propter rem ipsam non habitam,* at the time and place at which it should

have been delivered, including the damages resulting naturally, or according to the usual course of things, from the breach of the contract itself, as well as such as may reasonably be supposed to have been in the contemplation of both parties, when they made the contract, as the probable result of a breach of it. 1 Pothier on Obligations, 162, 163. 2 Kent Com. (6th ed.) 480, *note.* *Hadley* v. *Baxendale*, 9 Exch. 354.

As a general rule, the appropriate compensation for the breach of a contract to deliver goods is their market value in money at the time and place at which they should have been delivered, with interest thereon ; and it is admitted that such is the rule in an action against a carrier if the goods are never delivered. *Spring* v. *Haskell*, 4 Allen, 112. It is also settled beyond dispute that when a carrier negligently delays the delivery of goods, knowing that the owner intends to sell them in the market, he is liable for the diminution in their market value during the delay. *Smith* v. *New Haven & Northampton Railroad*, 12 Allen, 531. *Hamilton* v. *McPherson*, 28 N. Y. 77. *King* v. *Woodbridge*, 34 Verm. 565. Under those circumstances, such damages must have been in the contemplation of both parties ; and whether, without regard to that fact, they must be considered as naturally resulting from the breach of the contract itself is a question which was left open in the cases just cited, and is now directly presented for adjudication.

In the absence of evidence that the carrier knew or contemplated that the owner intended to sell the goods in the market, it is contended for the defendants that if the goods are not wholly lost, but only delayed, and afterwards delivered to and received by the owner, the measure of damages is interest during the delay on their market value at the time when they should have been delivered, and nothing more. But the objection to this is that it will never give a just compensation unless the goods are of the same value at the time of actual delivery as at the time when they should have been delivered ; for if the goods have increased in value, it is more, if they have diminished, it is less, than the plaintiff's loss. The thing which the plaintiff does not receive when he is entitled to it is goods of their value at

that time. The thing which he afterwards receives is goods of a value at a different time, which is not necessarily the same value. The general price of such goods in the market is the appropriate, if not the only legal, evidence of the value of the goods at any time in question. If the market value of the goods is less when they are actually delivered than it was when they ought to have been delivered, the fall in the market value is not a cause, but an incident or consequence, of the diminution in the intrinsic or merchantable value of the goods, and evidence of the degree of the injury which the plaintiff has suffered by the wrongful act of the defendant. A diminution in the market value of goods by the operation of general laws is a real and actual loss of a portion of the real and intrinsic value, as much as a change for the worse in the quality of the goods. By Shaw, C. J., in *Stone* v. *Codman,* 15 Pick. 301. A fall in the market is no more a cause of the diminished value of the goods than a fall in the thermometer or barometer is the cause of a change in the weather.

The true rule and measure of damages, in our opinion, whenever by reason of inexcusable delay of the carrier the goods are not delivered until after they have diminished in market value, is the amount of the diminution. This allows to the person injured the value, as exactly as it can be estimated in money, of that of which he has been finally deprived by the wrongful act of the defendant; and is the most simple and just rule, as well as the easiest to be applied; for it depends on the general market value of the goods, and involves no question of contingent or speculative profits, and no consideration of any other contracts made or omitted to be made by the plaintiff in view of his contract with the defendant. To refer to such other contracts, or the profits which might have resulted from them, not within the knowledge or contemplation of the defendant, would be to hold him liable for the consequences, or allow him the benefit, not of his own contract with the plaintiff, but of dealings between the latter and third persons, with which the defendant had nothing to do. *Fox* v. *Harding,* 7 Cush. 516. *Waite* v. *Gilbert,* 10 Cush. 177. *Le Peintur* v. *Southeastern Railway*

**2** Law Times, (N. S.) 170. *Gee* v *Lancashire & Yorkshire Railway*, 6 Hurlst. & Norm. 211.

The rule which we adopt in this case is the same which was affirmed in 1861 by independent judgments of the English courts of common bench and exchequer. *Wilson* v. *Lancashire & Yorkshire Railway*, 9 C. B. (N. S.) 632. *Collard* v. *Southeastern Railway*, 7 Hurlst. & Norm. 79. The distinction between loss of profits and diminution in the market value of the goods was well stated in the first of these cases by Mr. Justice Byles, who said, " Profits include the increased value arising from the purpose to which the plaintiff intended to apply the goods; whereas diminution in exchangeable value is only something subtracted from the inherent value of the articles themselves." " It is admitted that deterioration in quality is to be taken into account in estimating the damage the plaintiff has sustained; it is admitted also that loss or diminution in the quantity is to be taken into account; and I do not see why a loss in the exchangeable value of the goods should not also be taken into account." 9 C. B. (N. S.) 646.

The doctrine of these cases was recognized in *Great Western Railway* v. *Redmayne*, Law Rep. 1 C. P. 330, and the damages there refused were the profits which the plaintiff might have made if the goods had arrived in time. See also *Lord* v. *Midland Railway*, Law Rep. 2 C. P. 345, 346. In *Woodger* v. *Great Western Railway*, Ib. 318, expenses incurred by the plaintiff in waiting for the goods were disallowed, as they were by this court in *Ingledew* v. *Northern Railroad*, 7 Gray, 91. In *Smeed* v. *Ford*, 1 El. & El. 602, which was an action for not delivering a threshing machine at the time agreed in a contract of sale, the market price, evidence of which was excluded, was not the market price of the machine, the subject matter of the contract between the parties, but the market price of the wheat which the plaintiff threshed with that machine. The earlier case of *Black* v. *Baxendale*, 1 Exch. 410, was decided before the English courts had accurately defined the rule of damages in cases of this nature, but it contains nothing inconsistent with the later adjudications.

The defendants' counsel referred, by way of analogy, to the rule of damages in actions of trover, as inconsistent with the rule contended for by the plaintiffs in this case. But we can perceive no such inconsistency. The general rule is well settled in this commonwealth, that in an action of trover the measure of damages is the market value of the goods at the time of the conversion, and interest thereon, even if the defendant has since sold the goods at a higher price. *Kennedy* v. *Whitwell,* 4 Pick. 466. If the goods have by any means been restored to the owner, it goes in mitigation of damages; but only to the extent of their market value at the time of the restoration, and less all reasonable intervening charges; in short, so much only is deducted by way of mitigation from the damages, as the plaintiff has already in fact received. *Pierce* v. *Benjamin,* 14 Pick. 361. *Greenfield Bank* v. *Leavitt,* 17 Pick. 1. *Lucas* v. *Trumbull,* 15 Gray, 306. If the plaintiffs had demanded their goods on the day when they should have been delivered, and the defendants had refused or inexcusably neglected to deliver them, and had been sued in trover, the measure of damages would have been the same as we hold it to be in this case. The plaintiffs do not ask to charge the defendants with any higher value of the goods than that which they had at the time when they should have been delivered.

The case of *Denny* v. *New York Central Railroad,* 13 Gray, 481, in which the proprietors of a railroad, who, after negligently delaying the transportation of goods, transported them safely to the place of destination and there used due care in depositing them in a warehouse, were held not to be responsible for injuries to the goods while in their warehouse from a sudden flood is quite distinguishable from the present; for in that case the goods were uninjured in quality and undiminished in market value when the liability of the defendants as carriers ceased; and the flood was a special and extraordinary disaster acting upon the goods in question, not a consequence which according to the usual course of things arose from the delay, or could have been anticipated by the parties. More in point, and not distinguishable in principle from the present case, is the

decision that carriers are liable for diminution in the market value of goods from an ordinary change in the weather during a negligent delay in transportation. *Ingledew* v. *Northern Railroad,* 7 Gray, 86.

In New York, the question now before us has not been authoritatively determined by the court of appeals, and the number of judgments in the local courts and of opinions of individual judges upon each side of the question would seem, from the cases cited at the argument, to have been about equal. *Wibert* v. *New York & Erie Railroad,* 2 Kernan, 252, 258; *S. C.* 19 Barb. 36. *Scovill* v. *Griffith,* 2 Kernan, 513, 517, 518. *Kent* v. *Hudson River Railroad,* 22 Barb. 278. *Medbury* v. *New York & Erie Railroad,* 26 Barb. 564. *Jones* v. *New York & Erie Railroad,* 29 Barb. 633. *Conger* v. *Hudson River Railroad,* 6 Duer R. 375. A recent decision of the supreme court of Michigan accords with our conclusion in the present case. *Sisson* v. *Cleveland & Toledo Railroad,* 14 Mich. 489.

*Exceptions sustained*